**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| Melinda Budde, on behalf of herself and all others similarly situated, | |
| Plaintiff, | |
| v. | Civil Case No. 21-CV-2095 |
| (1) Syngenta Corporation,<br>(2) Bayer CropScience Incorporated,<br>(3) Bayer CropScience LP,<br>(4) Corteva Incorporated,<br>(5) BASF Corporation,<br>(6) Cargill, Incorporated,<br>(7) Winfield Solutions, LLC,<br>(8) Univar Solutions, Incorporated,<br>(9) CHS Incorporated,<br>(10) Nutrien Ag Solutions, Inc.,<br>(11) GROWMARK, Incorporated,<br>(12) Simplot AB Retail Sub, Incorporated,<br>(13) Tenkoz Inc.,<br>(14) Federated Co-operatives Ltd., | Jury Trial Demanded |
| Defendants. | |

## CLASS ACTION COMPLAINT

Plaintiff Melinda Budde ("Plaintiff"), individually and on behalf of all others similarly situated, brings this Class Action Complaint against Defendants Syngenta Corporation; Bayer CropScience Incorporated; Bayer CropScience LP; Corteva Incorporated; BASF Corporation; Cargill, Incorporated; Winfield Solutions, LLC; Univar Solutions, Incorporated; CHS Incorporated; Nutrien Ag Solutions, Inc.; GROWMARK, Incorporated; Simplot AB Retail Sub, Incorporated; Tenkoz Inc.; and Federated Co-operatives Ltd. (together, "Defendants"), and alleges:

**INTRODUCTION**

1.      This lawsuit arises from a scheme to defraud in which Defendants deprived farmers of a free and open market and artificially increased the price of Crop Inputs (such as seed and crop protection chemicals like fungicides, herbicides, and insecticides) by engaging in an unlawful conspiracy to boycott electronic platforms, like Farmers Business Network, which sought to bring price transparency, increased information about Crop Inputs, and increased competition to the market. From this scheme to defraud, Defendants have caused millions of dollars of damages in supra-competitive prices.

2.      Defendants dominate all levels of the Crop Input market. Through a coordinated enterprise in which they all participated, either directly or indirectly, Defendants have established a secretive supply-chain process using authorized licenses, commissions, rebates, and incentives to keep Crop Input prices inflated at supra-competitive levels and deny farmers access to relevant market information. This opaque Crop Input market prevents farmers from comparison shopping, making better-informed purchasing decisions, and discovering deceptive seed relabeling practices. Defendants also seek to control and capitalize on farmers' data through the development of farm management platforms.

3.      The cost of Crop Inputs is increasing at a significantly faster rate than profits from farmers' crop yields. These increases are proving increasingly devastating to farmers, who are now the least profitable level of the American food supply chain and are drowning in hundreds of billions of dollars of operating debt that is forcing them into bankruptcy at a record pace.

4.      Starting in at least 2014, independent online Crop Input sales platforms, like FBN, threatened Defendants' supra-competitive prices, dominant market position, control over Crop Input pricing, and present and future access to farmers' data. FBN marketed itself as allowing users to compare prices across products and suppliers (helping farmers negotiate), delivering Crop

Inputs directly to the farmer, and allowing farmers to compare performance of Crop Inputs across the entire market. FBN and similar platforms were initially very popular with farmers.

5.     Because of the threat from the success of these platforms, Defendants conspired and coordinated to boycott these online Crop Input sales platforms. Manufacturer Defendants and Wholesaler Defendants agreed amongst themselves not to sell to FBN. Syngenta, Bayer, BASF, and Corteva have used audit provisions in their agreements with retailers to ensure that no retailer goes around the boycott and provides Manufacturer Defendants' Crop Inputs to FBN.

6.     Defendants' boycott was successful. In the United States, FBN has not been able to sell name-brand Crop Inputs, with the exception of obtaining occasional excess products from brokers.

7.     Defendants' enterprise to manipulate the Crop Input market continued when FBN tried to enter the Canadian market by purchasing an existing retailer with long-standing supply agreements. But after coordination, Defendants again almost simultaneously chose to end those supply agreements and boycott future sales to FBN in Canada. This activity has drawn the attention of Canada's Competition Bureau ("CCB"), which is formally investigating Defendants for collusion under Section 10 of the Competition Act Canada (R.S.C., 1985, c. C-34).

8.     Additionally, the U.S. Department of Justice and Federal Trade Commission are investigating these anti-competitive practices in the United States.

9.     As a direct and proximate result of Defendants' scheme to defraud through anticompetitive conduct, Defendants have been able to maintain their supra-competitive prices, control over farmer data, and an opaque Crop Input market preventing farmer bargaining or comparison shopping. This behavior not only shut down existing competitors but also chilled other potential market entrants. For example, another online platform, AgVend, deliberately designed

its platform not to threaten Defendants' pricing model based on what they saw happen to FBN.

<strong>PARTIES</strong>

10.    **Plaintiff Melinda Budde** is a resident and citizen of Kansas. During the Class Period, Plaintiff Budde purchased one or more of the Crop Inputs from one or more of Defendants for her own use in her farming operation and not for resale. Plaintiff suffered injury to her property as a result of Defendants' conduct alleged herein.

A.    **<u>The Manufacturer Defendants</u>**

11.    Defendant Syngenta Corporation is a Delaware corporation and is the main U.S.-based operating subsidiary of Syngenta AG. It is headquartered in Wilmington, Delaware. Syngenta develops, manufactures, and sells Crop Inputs in the United States.

12.    Bayer AG is a multinational pharmaceutical, chemical, and agriculture company. It organizes itself into four divisions, each with its own management and corporate organization. Legal entities within each division work together, follow a common strategy, and report up to the same level of management.

13.    Defendant Bayer CropScience Incorporated is a wholly-owned subsidiary of Bayer AG, headquartered in St. Louis, Missouri and incorporated in New York, that develops, manufactures, and sells Crop Inputs in the United States.

14.    Defendant Bayer CropScience LP is a wholly-owned subsidiary of Bayer AG, headquartered in Research Triangle Park, North Carolina, and is a crop science company that sells Crop Inputs in the United States.

15.    Bayer CropScience Incorporated and Bayer CropScience LP both operate as part of the Bayer Group's Crop Science division.

16.    Defendant Corteva Incorporated is a Delaware corporation, headquartered in Wilmington, Delaware, that develops, manufactures, and sells Crop Inputs in the United States.

4

17.     Defendant BASF Corporation is a Delaware corporation, headquartered in Florham Park, New Jersey, and is the principal U.S.-based operating entity and largest subsidiary of BASF SE, a multinational pharmaceutical, seed, and chemical company. BASF develops, manufactures, and sells Crop Inputs in the United States.

**B.  The Wholesaler Defendants**

18.     Defendant Cargill, Incorporated is a Delaware corporation headquartered in Minneapolis, Minnesota. Cargill owns and operates a wholesaler, AgResource Division, which distributes Crop Inputs to Cargill's retail network and to retailers. Cargill's AgResource Division maintains contracts with each of Bayer, Corteva, BASF, and Syngenta entitling it to purchase and distribute branded Crop Inputs and entitling it to special rebates.

19.     Defendant Winfield Solutions, LLC is a Delaware corporation headquartered in Arden Hills, Minnesota. Winfield is a Crop Inputs wholesaler. It maintains contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute branded Crop Inputs and entitling it to special rebates. Winfield is also a major Crop Inputs retailer that operates as a cooperative owned by its members, which are 650 Crop Inputs retail businesses operating 2,800 retail locations throughout the United States and parts of Canada.

20.     Defendant Univar Solutions, Incorporated is a Crop Inputs wholesaler. Univar maintains contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute branded Crop Inputs and entitling it to special rebates. Univar is a domestic corporation headquartered in Illinois and incorporated in Delaware.

**C.  The Retailer Defendants**

21.     Defendant CHS Incorporated is one of the largest Crop Inputs wholesalers in the United States. Like many large wholesalers, it also operates retail networks bearing the CHS brand around the country that sell Crop Inputs from brick-and-mortar stores. CHS is incorporated and

headquartered in Inver Grove Heights, Minnesota.

22.     CHS and the retail networks it operates maintain contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute Crop Inputs and entitling it to special rebates.

23.     Defendant Nutrien Ag Solutions, Inc. is both a Crop Inputs wholesaler and the largest Crop Inputs retailer in the United States. It sells Crop Inputs to farmers throughout the country and maintains contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute Crop Inputs and entitling it to special rebates. Nutrien is incorporated in Delaware and has its principal place of business in Colorado.

24.     Defendant GROWMARK, Incorporated, d/b/a Farm Supply or FS, is a large Crop Inputs retailer headquartered in Illinois, with brick-and-mortar locations throughout the Midwestern United States. Growmark is incorporated in Delaware. Growmark maintains contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute Crop Inputs and entitling it to special rebates.

25.     Defendant Tenkoz Inc. is one of the largest Crop Inputs retailers in the United States. Tenkoz purchases and sells 25% of all crop protection chemicals sold in the United States annually through 550 retail locations and 70 wholesale locations around the country. Tenkoz is incorporated and headquartered in Georgia. Tenkoz maintains contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute Crop Inputs and entitling it to special rebates.

26.     Defendant Simplot AB Retail Sub, Incorporated, f/k/a Pinnacle Agriculture Distribution, Incorporated, is a large Crop Inputs wholesaler and retailer that operates 135 retail locations across 27 states. Simplot is headquartered in Boise, Idaho and incorporated in

Mississippi. Simplot maintains contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute Crop Inputs and entitling it to special rebates.

27.     Defendant Federated Co-operatives Ltd. is a large Crop Inputs retailer. It maintains contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute Crop Inputs and entitling it to special rebates. Federated is under investigation by the Canadian Competition Bureau for engaging in coordinated anticompetitive practices designed to exclude competition in the Crop Inputs market.

## VENUE AND JURISDICTION

28.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action in which the aggregate amount in controversy exceeds $5,000,000 (exclusive of interest and costs), the number of the members of the Class exceeds 100, and at least one member of the putative Class is a citizen of a state different from that of one of the defendants. This Court also has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c).

29.     This Court has personal jurisdiction over Defendants because Defendants are amenable to service of process, are co-conspirators, and each has minimum contacts with this District, has purposefully availed itself of the privilege of conducting business in this state by mailing, selling, marketing, and distributing thousands of Crop Inputs every month, and Plaintiff's claims arise out of Defendants' conduct in this District.

30.     Venue is proper in this forum pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to these claims occurred in this District, including Crop Input sales made by Defendants; each Defendant is subject to personal jurisdiction in this District; and Defendants transact business in this District.

## FACTUAL BACKGROUND

### A.  **The Industry**

31.     Because of the current structure of the Crop Input market, farmers are forced to pay supra-competitive prices in part because they are denied accurate product information, including pricing information, which would allow them to make better-informed purchasing decisions. As a result, the average price American farmers pay for Crop Inputs is increasing at a rate that dramatically outpaces yields.

32.     For example, over the last 20 years, the price of one type of Crop Input, seed corn, rose 300%, while corn yields increased only 33% to 35%. In 1989, U.S. farms spent $15.6 billion overall on chemicals, fertilizer, and seeds. This number rose to $59 billion in 2019, outpacing inflation by 60%. Crop Inputs have consequently composed a larger share of farm budgets. In 1989, Crop Inputs composed 12.6% of farm expenditures; by 2019, Crop Inputs composed 16.4% of farmer spending.



---

[1] Jacob Bunge, "Tech Startup, Trying to Be Amazon for Farms, Runs into Ag Giants," *The Wall Street Journal* (Aug. 30, 2020), https://www.wsj.com/articles/tech-startup-trying-to-be-amazon-for-farms-runs-into-ag-giants-11598811850.

33.     "In 1994, the top four seed companies controlled only 21 percent of the global seed market. By 2013, just the top three controlled 55 percent, with Monsanto alone controlling more than a quarter. With that increase in concentration has come a shocking increase in the cost of seed, because these giants face little pressure to compete on price. USDA data shows that the per-acre cost of soybean and corn seed spiked dramatically between 1995 and 2014, by 351 percent and 321 percent, respectively. . . . Moreover, even as farmers are paying monopoly prices for a diminishing selection of seed strains produced by handful of giant corporations, they also are paying monopoly prices for fertilizers and pesticides, often to the same corporations. Since 2017, the Big Six seed and agrichemical companies have shrunk to four, after Dow merged with DuPont and Bayer purchased Monsanto. The top four producers of nitrogen fertilizer controlled 34 percent of the market in 1977, but by 2015 had increased their share to more than two-thirds."[2]

34.     In a 2018 survey, 80% of farmers reported that their costs had only continued to increase. As a result, farmers cannot pay their outstanding operating debts—estimated at well over $400 billion in 2019—and the rate of farm bankruptcies has accelerated, with declared farm bankruptcies increasing by 24% from 2018 to 2019, the biggest yearly increase since the Great Recession.

35.     These increases are proving increasingly devastating to farmers, who are now the least profitable level of the American food supply chain and are drowning in hundreds of billions of dollars of operating debt that is forcing them into bankruptcy at a record pace.

36.     Indeed, farmers' debt-to-income ratios are the highest they have been in three

---

[2] Claire Kelloway, "How to Close the Democrats' Rural Gap," *Washington Monthly* (Jan./Feb./Mar. 2019), https://washingtonmonthly.com/magazine/january-february-march-2019/how-to-close-the-democrats-rural-gap/.

decades.[3]

37.     This steady cost increase is not attributable to escalating research and development expenditures, which have decreased considerably over the past several years. Rather, it is the result of inflated and unjustifiable increases in the prices farmers pay for Crop Inputs—the seeds and chemicals such as fertilizer, insecticide, and herbicide used to produce a crop—and the supra-competitive prices paid by farmers as a result of Defendants' wrongful conduct, including their group boycott of electronic distribution platforms as alleged in this Complaint.

38.     These inflated prices persist—and wreak financial havoc on America's farmers—by Defendants' design. The Crop Inputs market is structured, from top to bottom, to maximize opacity and deny farmers access to the objective pricing data and product information they need to make informed decisions about the Crop Inputs they buy. Farmers, through no fault of their own, are unwittingly paying more for Crop Inputs than they would in a truly competitive market. Farmers lack the objective information and data needed to gauge whether their investments are worthwhile, as well as any ability to purchase Crop Inputs without paying unnecessary overhead to brick-and-mortar retailers and other costs.

39.     This opacity begins at the very top of the Crop Inputs market, where the Manufacturer Defendants who develop and produce between 75% and 90% of the most popular Crop Inputs[4] closely guard their product prices.

40.     Then, to maintain that secrecy, Manufacturer Defendants allow only wholesalers,

---

[3] Claire Kelloway, "How to Close the Democrats' Rural Gap," *Washington Monthly* (Jan./Feb./Mar. 2019), https://washingtonmonthly.com/magazine/january-february-march-2019/how-to-close-the-democrats-rural-gap/.
[4] Bayer, Corteva, BASF, and Syngenta control much of the market for seeds and agrichemicals, selling 76% of all agrochemicals globally and 76% of all soybean, 85% of all corn, and 91% of all cotton seeds in the U.S. Claire Kelloway, "Canadian Antitrust Enforcers Investigating Big Ag for Stifling Startup," Open Markets Blog (Feb. 13, 2020), https://www.openmarketsinstitute.org/publications/canadian-antitrust-enforcers-investigating-big-ag-stifling-startup.

including the Wholesaler Defendants, retailers the manufacturers own or operate, and retailers such as the Retailer Defendants that are licensed "authorized retailers," to sell the Manufacturer Defendants' Crop Inputs.

41.     The Manufacturer Defendants' contracts granting "authorized retailer" licenses contain strict confidentiality provisions that require authorized retailers to keep confidential the manufacturers' prices, as well as any incentives, rebates, and commissions offered by the manufacturers to their authorized retailers.

42.     Manufacturer Defendants also use a tactic known as "seed relabeling" to capitalize on farmers' lack of objective performance data. Seed relabeling is the practice of taking seeds that have been on the market under a given brand name for some time and repackaging the seeds under a new brand name so that they can be sold at a new, higher price, even though the seeds are the same.

43.     Pricing is no more transparent at the retail level. To the contrary, wholesalers' contracts with authorized retailers also contain strict confidentiality provisions. Retailers cannot disclose to customers the price paid to the wholesaler for their Crop Inputs or the price at which retailers sell those Crop Inputs to other farmers. To further muddy the market waters, retailers sell Crop Inputs and related services (e.g., spraying or applying chemicals) in bundles, making it difficult—if not impossible—for farmers to discern the price they are charged for any individual Crop Input or service.

44.     Because of this opacity and relabeling, farmers can pay materially different prices for the same Crop Inputs. As FBN Co-Founder Charles Baron explained, "What we found was that the price differences farmers were experiencing in the market were horrendous. You could have chemical prices being seven times each other between two farms and certain products, and

seed prices varying by 100 percent within a state. That is caused by a lack of transparency."[5]

45.     Many farmers feel like they cannot find competitive, affordable Crop Input options.[6]

46.     Over the past five years, Defendants have also invested heavily in proprietary software that gathers and utilizes farmers' data.

47.     For example, Defendant Corteva (then Dow Chemical) acquired a digital farm management platform, Granular. Defendant Corteva uses its farm-management platforms in the aggregate to develop products and services, and individually to target products of interest to farmers including marketing communications for other Corteva seed and chemical Crop Input products. Defendant Corteva also uses Granular to provide exclusive offers on products and services designed based on consumer data.

48.     Similarly, Defendant Bayer is currently developing a digital application in-house to use on-farm data as a means of selling its expertise and products to farmers. Defendant Corteva markets its AgriEdge whole-farm management program as a solution to empower farmers to make faster, data-driven decisions. Defendant Corteva also uses farmer data for marketing purposes.

**B.  The Threat from FBN and Transparency-Based Electronic Sales Platforms**

49.     Recognizing these inefficiencies, several electronic Crop Inputs sales platforms launched over the past decade. These electronic platforms aimed to provide a cheaper, more transparent way for farmers to buy Crop Inputs, circumventing the existing opaque, convoluted distribution system. Most notably, Farmers Business Network ("FBN"), a leading electronic sales

---

[5] Dale Buss, "Farmers Business Network Plows New Ground," *Chief Executive* (Dec. 23, 2020), https://chiefexecutive.net/farmers-business-network-plows-new-ground/.
[6] Claire Kelloway, "Canadian Antitrust Enforcers Investigating Big Ag for Stifling Startup," Open Markets Blog (Feb. 13, 2020), https://www.openmarketsinstitute.org/publications/canadian-antitrust-enforcers-investigating-big-ag-stifling-startup.

platform and Silicon Valley startup, was extremely popular with farmers upon launch, and has successfully raised millions of dollars from leading venture capital firms to build out capacity to supply Crop Inputs in a manner that met farmers' demand for transparent pricing and comparison of products. FBN also offered direct-to-farm delivery.

50.     At first, those efforts showed extraordinary promise, as farmers gravitated toward these electronic platforms in search of better, fairer prices for Crop Inputs. For example, more than 12,000 farmers signed up for FBN's service that provides objective performance data on Crop Inputs, and 6,000 farmers signed up for FBN's electronic platform that was designed to sell Crop Inputs online. FBN overall has over 21,000 members, and most recently raised $250 million in Series F funding to continue its efforts "to improve the profitability of farming families . . . for generations to come."

51.     Despite claims that FBN is not in touch with the Farm Belt, 80 to 90 percent of FBN's 500 employees are located in rural communities in South Dakota, Montana, Alberta and Australia. They have dozens of facilities around the country, including distribution centers and warehouses, and hundreds of farmer dealers in communities. As FBN co-founder Charles Baron explained to *Chief Executive*: "So when [competitors] say FBN isn't local, that's absurd. Besides, the most important 'local business' in the farm system is the farmer's farm; it's the core economic engine. And that's where we are."[7]

52.     FBN does not sell farmers' data to other companies, and only shares data if directed by farmers.

53.     Farmers were able to use the price and product database provided by FBN to bargain with suppliers for better deals.

---

[7] Dale Buss, "Farmers Business Network Plows New Ground," *Chief Executive* (Dec. 23, 2020), https://chiefexecutive.net/farmers-business-network-plows-new-ground/.

54.     The success of electronic platforms, and FBN in particular, drew negative attention from the Wholesaler and Retailer Defendants, which recognized these new entrants threatened their traditional role in the Crop Inputs market, and more importantly, threatened their profit margins. FBN stands out because of its popularity and potential to significantly disrupt traditional Crop Inputs supply and pricing.

55.     As a report published by CoBank, a cooperative partly owned by Crop Inputs retailers and a major lender to grain cooperatives, explained, "Despite relatively low sales, **e-commerce companies pose a threat to brick-and-mortar ag retailers** in two ways. First, any new competitor will erode sales and margins to some degree and second, e-commerce sites increase transparency for product prices." That price transparency would allow farmers to negotiate more effectively with Crop Inputs retailers, thus eating into the retailers' margins.

56.     On February 2, 2016, *CropLife* magazine, a trade publication published by CropLife America (a trade association comprising of the major Crop Inputs manufacturers, wholesalers, and retailers), echoed CoBank's sentiments, and wrote repeatedly about the danger electronic platforms posed to Crop Inputs retailers' business model. *CropLife* stated it was "concerned that the retailer could be disintermediated—a fancier and less draconian way of saying [electronic platforms would] 'cut out the middle man'—**allowing growers to find product conveniently and at a lower market price**," and decried "the devil known as 'price transparency,'" commenting that "[g]rowers were not really as interested in buying and selling and storing product as they were in printing price lists off the Internet and waving them in their retailer's faces. Already low margins were about to race to the bottom."

57.     In late fall 2017, CropLife's PACE Advisory Council—a committee composed of the "heads of major ag retailers, market suppliers, equipment makers, and other agricultural

analysts"—explicitly called out the threat posed by electronic platforms to retailers and wholesalers at its annual meeting. *CropLife*'s coverage of the event reported that "three letters . . . continually cropped up no matter what the topic of conversation happened to be – FBN (Farmers Business Network). To say that all things related to FBN and its business practices dominated much of the day-long event would be a gross understatement. Several members of the PACE Council described how **FBN had negatively affected their businesses during 2017 by cutting into their already slim margins on various products**."

58.     In February 2018, *CropLife* reported on a local "huge price war in chemicals" in Iowa in 2017 as a result of FBN competing in the market. A retailer competing with FBN urged that "'ag retailers need to get proactive' in dealing with the threat of disintermediation." Another retailer noted that "as we get more competitive with the FBNs of the world, **we'll obviously have to cut back on services and support (at times). But what concerns me is when . . . the legal implications of that is you are a big business now and the regulatory burden becomes more significant**."

59.     Independent farm management platforms like FBN also pose a threat to the data-heavy farm management platforms being acquired or built in-house by Defendants. By providing independent expertise, platforms like FBN deprive Defendants of access to data for crop and service development and targeted marketing opportunities.

C.   **Defendants Block FBN's Access to the Crop Inputs Market**

60.     FBN threatened the Defendants' dominant market position and control over Crop Inputs pricing. As a result, rather than compete fairly with FBN, Defendants conspired to block its access to Crop Inputs by engaging in a group boycott. For instance, the Manufacturer, Wholesaler, and Retailer Defendants repeatedly blocked FBN's access to Crop Inputs by agreeing among themselves not to sell products to FBN.

61.     Starting in 2016 after FBN entered the United States market as an electronic Crop Inputs sales platform, the Manufacturer Defendants complied with the Retailer and Wholesaler Defendants' demand and initiated a joint boycott of electronic platforms, including of FBN, the target of CropLife's report. As a result, when FBN reached out to the Manufacturer and Wholesaler Defendants for Crop Inputs, they all refused to supply FBN, offering only pretextual excuses for their refusal.[8]

62.     The Manufacturer Defendants refused to supply seed and pesticide products to FBN and did not allow the electronic platform to sell products crucial to the U.S. Farm Belt, such as Syngenta's Force insecticide and Corteva's Pioneer corn seed.[9]

63.     To ensure this boycott was successful, Defendants imposed strict penalties on retailers who failed to fall in line. For example, in March 2018, after learning that some retailers had sold seed and spray products to FBN despite the boycott, Syngenta initiated an audit of its authorized retailers and brokers to identify and punish the retailers that had made those sales. Syngenta's Head of U.S. Crop Protection Sales provided pretextual reasons, "[w]e have concerns about product integrity, stewardship, and regulatory compliance."[10]

64.     Bayer, BASF, and Corteva similarly include mandatory language in their form contracts with authorized retailers that allows them to audit authorized retailers' books and records and perform on-site inspections at any time. Bayer, BASF, and Corteva used these provisions to

---

[8] Jacob Bunge, "Canadian Antitrust Officials Probe Farm Giants," *The Wall Street Journal* (Feb. 6, 2020), https://www.wsj.com/articles/canadian-antitrust-officials-probe-farm-giants-11580990400; Jacob Bunge, "Tech Startup, Trying to Be Amazon for Farms, Runs into Ag Giants," *The Wall Street Journal* (Aug. 30, 2020),        https://www.wsj.com/articles/tech-startup-trying-to-be-amazon-for-farms-runs-into-ag-giants-11598811850.
[9] Jacob Bunge, "Tech Startup, Trying to Be Amazon for Farms, Runs into Ag Giants," *The Wall Street Journal* (Aug. 30, 2020), https://www.wsj.com/articles/tech-startup-trying-to-be-amazon-for-farms-runs-into-ag-giants-11598811850.
[10] *Id.*

ensure that electronic platforms could not go around their agreed-upon boycott and secure branded Crop Inputs by buying from an authorized retailer.

65. In the United States, FBN has not been able to sell name-brand Crop Inputs with the exception of obtaining occasional excess products from brokers. As a result, FBN is only able to rely on suppliers of generic Crop Inputs, but many farmers have concerns about generic products' quality. Additionally, as discussed above, the effect of Defendants' wrongful conduct has extended into the generic market, further stifling FBN's options. FBN, starved of Crop Inputs, has since begun developing its own products, including seeds, herbicides, and insecticides, to sell to farmers through its electronic platform. Due to high costs for developing Crop Inputs, FBN had to lay off employees, and as of August 2020, has yet to turn a profit.

66. This is not the first time Defendants had worked together to stop similar competition. In a February 2, 2016 article, CropLife magazine criticized another electronic platform in its article, XSAg.com (currently known as FarmTrade, LLC or FarmTrade.com), one of the original electronic platform trailblazers that had launched to offer "a virtual playing field" for the purchase and sale of certain Crop Inputs electronically, essentially operating as a trading platform. CropLife described XSAg's entry as a "punch [that] came out of the shadows and landed a nasty body blow" to threaten retailers, but "[c]rop protection manufacturers and the distribution channel eventually figured out how to do battle with the pricing revelations XSAg brought to the market, but it was unnerving and unhappy time." As the trade publication made clear, manufacturers and the distribution channel partners recognized the threat from transparent, electronic platforms and worked together to block the threat.

67. In 2018, Defendants continued to work together to counter an additional threat: FBN's entrance into the Canadian market. On March 27, 2018, in a further attempt to combat

Defendants' boycott, FBN announced its purchase of Yorkton Distributors Ltd. ("Yorkton"), a Canada-based retailer with decades-old supply agreements with Defendants Bayer, Syngenta, BASF, Corteva, and Winfield. These agreements, if honored, would have provided FBN with Crop Inputs inventory to sell to farmers at competitive prices.

68.     Before purchasing Yorkton, in early 2018, FBN asked manufacturers whether they would continue to supply Yorkton with their products if FBN purchased it, and "no one indicated they'd be disfavorable."[11] But that was before a coordinated campaign kicked in.

69.     After FBN's purchase, the Wholesaler and Retailer Defendants put pressure on the Manufacturer Defendants to stop supplying Crop Inputs to Yorkton. On March 31, 2018, four days after FBN announced its purchase of Yorkton, Federated warned the new competitor would upend their business models, writing, "[h]ow our key manufacturing partners decide to engage with this business will be closely observed by us and likely all of our traditional retailing peers across Western Canada." Other market participants have confirmed that this email was also circulated outside of Federated to one or more other industry participants.[12]

---

[11] Jacob Bunge, "Tech Startup, Trying to Be Amazon for Farms, Runs into Ag Giants," *The Wall Street Journal* (Aug. 30, 2020), https://www.wsj.com/articles/tech-startup-trying-to-be-amazon-for-farms-runs-into-ag-giants-11598811850

[12] Application Record, *The Commissioner of Competition v. Federated Co-Operatives Limited*, Court File No. T-153-20, pp. 10, 25 (Jan. 30, 2020).

**From:** Patrick Bergermann <Patrick.Bergermann@fcl.crs>
**Sent:** Saturday, March 31, 2018 8:05 AM
**To:** Patrick Bergermann <Patrick.Bergermann@fcl.crs>
**Cc:** Ron Healey <Ron.Healey@fcl.crs>; Daniel Caldwell <Daniel.Caldwell@fcl.crs>; Ken Bartsch
<Ken.Bartsch@fcl.crs>
**Subject:** FBN acquires Yorkton Distributors

It was recently announced that FBN has acquired Yorkton Distributors, supporting the viewpoint that
an online-only model will fail to deliver on farmer's local service needs in the crop inputs sector. How
our key manufacturing partners decide to engage with this business will be closely observed by us
and likely all of our traditional retailing peers across Western Canada. The current Western Canadian
model of crop input distribution has done much to partner with manufacturers to retain value in the
marketplace and drive adoption of new technologies which will help promote further investment into
this important sector to our economy. Those who threaten to undermine the current distribution
model will have long-term effects not only on current retailing channels, but on manufacturers
seeking to create marketplace value as well.

Although we understand the need for Yorkton Distributors, as a current bricks-and-mortar business,
to deliver upon their customer commitments for this upcoming spring, we also have significant
concerns regarding the potential to utilize the purchase as a direct access point to traditional
manufacturer brands through a low-asset, low-value model. Support of this paradigm should be
viewed similarly to supporting other low-value entities which have traditionally sold farmer
memberships in the name of lower price points. In our case, over 250 Grow Team members seek to
add value to our industry every day by focusing on promotion of new, cutting-edge technologies
delivering increased value to farm customers. We trust that our traditional business partners will
continue to see the value of the current retail channels, rather than supporting the degradation of our
marketplace.

We will be paying close attention to how the industry responds.

Sincerely,

Patrick Bergermann

**Patrick Bergermann**
Director, Crop Supplies
Ag and Consumer Business
Federated Co-operatives Limited

P: 306.244.3321
401 22nd Street East, Saskatoon, SK S7K 0H2, Canada
Patrick.Bergermann@fcl.crs | www.fcl.crs

 CO·OP   Integrity • Excellence • Responsibility

70.     Less than one week after Federated's warning, on April 6, 2018, Univar emailed

retailers that it would refuse to supply its products to Yorkton or FBN, warning that the new

competition would decrease profit margins in the industry. Univar had informed FBN that Univar

would no longer conduct business with the company beyond July 31, 2018. Univar also sent an

email notifying its retail customers and manufacturers of its decision not to do business with FBN

and provided false and misleading talking points to justify its decision.[13] That message includes talking points that incorrectly claims that "FBN is a data company that wants to collect and aggregate data to eventually sell for a profit to companies that will use the data to make farmers grow us food for nothing . . . If anyone thinks socialism is going to feed the world[,] just call Russia first and see how that worked out." Univar further criticized FBN's business model of bringing market transparency to farmers, declaring that "[m]argin compression is not the way to a brighter future and that is all FBN is currently offering."

Speaking Notes:
- Univar supports the value independent retailers bring to the marketplace and their contributions to the communities they operate in. *Is that online tool going to bring you the skid of product you need on a Sunday?*
- Univar will continue to support and grow the independent movement through capital asset investment in the marketplace and innovative initiatives. *Bricks, Mortar & Trucks that you can see and trust and gets you the product when you need it.*
- Univar will only support long term value added businesses that benefit dealers and growers. *FBN is data company that wants to collect and aggregate data to eventually sell for a profit to companies that will use the data to make farmers grow us food for nothing! If anyone thinks Socialism is going to feed the world just call Russia first and see how that worked out.*
- Univar supports the discovery companies, post patent providers, seed companies, fertilizer companies and Ag dealers that do the important and honorable work of delivering innovation, supporting farmers and making it possible to feed the world together. *Margin Compression is not the way to a brighter future and that is all FBN is currently offering.*

I will be sending a brief note to all our supplier partners notifying them of our position. You can feel free to share this note with your customers. Keep up the great work and focus on your teammates, customers and building Pride of Association with Univar.

You're Independent. Not Alone.

Best Regards,

Neil

Neil Douglas
Vice President - Agriculture
Univar Canada Ltd.
Winnipeg, MB
T  +1 204 928 7223
M +1 204 230 7161
F  +1 204 489 0881
neil.douglas@univar.com
www.univar.com
www.univarag.com

---

[13] Application Record, *The Commissioner of Competition v. Univar Canada Ltd.*, Court File No. T-154-20, pp. 10, 30-31 (Jan. 30, 2020).

71.     Faced with threats of retaliation from wholesalers and retailers, the Manufacturer Defendants agreed to boycott Yorkton and abruptly canceled their longstanding supply contracts within only a few months of its March 2018 acquisition by FBN, causing Yorkton to lose two-thirds of its branded products.[14] Bayer (June 15, 2018), Corteva (on August 27, 2018), and Cargill (on August 3, 2018) informed FBN they would no longer sell Crop Inputs, including seeds and pesticides, or sell only limited quantities to Yorkton.[15] Winfield also advised that it would not supply FBN with Crop Inputs on May 8, 2018.[16]

72.     Like Defendants' boycott in the U.S., Defendants' boycott in the Canadian market was also successful. FBN is effectively unable to sell all branded crop protection products in Canada. FBN was forced to lease Yorkton to a Canadian retailer to balance its large investment losses, although Yorkton continues to face boycotts by its former suppliers because of FBN's ownership.

73.     Recently, Defendants' exclusion of FBN drew the attention of Canada's Competition Bureau ("CCB"), which is formally investigating Defendants for collusion under Section 10 of the Competition Act Canada (R.S.C., 1985, c. C-34). The inquiry is focused on the conduct of Federated Co-operatives Limited, Cargill Limited, Winfield United Canada ULC, Univar Canada Ltd., BASF Canada Inc., Corteva Inc. and/or its affiliates, and Bayer CropScience

---

[14] Jacob Bunge, "Tech Startup, Trying to Be Amazon for Farms, Runs into Ag Giants," *The Wall Street Journal* (Aug. 30, 2020), https://www.wsj.com/articles/tech-startup-trying-to-be-amazon-for-farms-runs-into-ag-giants-11598811850

[15] Application Record, *The Commissioner of Competition v. Cargill Limited*, Court File No. T-155-20, p. 10 (Jan. 30, 2020); Application Record, *The Commissioner of Competition v. Production Agriscience Canada Company, Pioneer Hi-Bred Canada Company, Dow Agrosciences Canada Inc.*, Court File No. T-157-20, p. 10 (Jan. 30, 2020) (Respondents are entities engaged in sales and marketing of Crop Inputs in Canada for Corteva Agriscience, the entity resulting from the merger of The Dow Chemical Company and E. I. du Pont de Nemours and Company); Application Record, *The Commissioner of Competition v. Bayer Cropscience Inc. and Monsanto Canada ULC*, Court File No. T-159-20, pp. 10-14 (Jan. 30, 2020).

[16] Application Record, *The Commissioner of Competition v. Winfield United Canada ULC*, Court File No. T-156-20, p. 10 (Jan. 30, 2020).

Inc. and its wholly-owned subsidiary Monsanto Canada ULC in the seed and crop protection markets. The CCB is investigating whether those entities engaged in practices reviewable under Part VIII of the Competition Act Canada.

74.     In the course of the CCB investigation, on February 11, 2020, a Canadian federal court granted in full *ex parte* applications made by Canada's Commissioner of Competition for the production of records against Cargill Limited, Winfield United Canada ULC, Univar Canada Ltd., BASF Canada Inc., Bayer CropScience Inc. and its wholly-owned subsidiaries Monsanto Canada ULC and Production Agriscience Canada Company, Pioneer Hi-Bred Canada Company and Dow Agrisciences Canada Inc. relating to those practices.

75.     Critically, and over Defendants' objections, the Canadian federal court found sufficient evidence to require Defendants to produce records concerning their coordinated anticompetitive conduct in the United States as well.

76.     The United States Department of Justice is monitoring the Competition Bureau's investigation and is deciding whether to launch its own investigation into Defendants' concerted refusal to supply electronic platforms with Crop Inputs.[17] The Competition Bureau noted that the Department of Justice's civil investigation into BASF Corporation had uncovered records of its views of the potential competitive significance of Farmers Business Network in the United States.[18] It also noted that merger review documents of Bayer CropScience LP indicate a substantive consideration of Farmers Business Network Inc. in the United States and its potential

---

[17] Jacob Bunge, "Tech Startup, Trying to Be Amazon for Farms, Runs into Ag Giants," *The Wall Street Journal* (Aug. 30, 2020), https://www.wsj.com/articles/tech-startup-trying-to-be-amazon-for-farms-runs-into-ag-giants-11598811850.

[18] Application Record, *The Commissioner of Competition v. BASF Canada Inc.*, Court File No. T-155-20, p. 11 (Jan. 30, 2020).

competitive significance.[19]

77.     The United States Federal Trade Commission ("FTC") is also investigating potential anticompetitive conduct in the Crop Inputs market. At least one defendant, Corteva received a subpoena from the FTC. According to its 10-Q filing, Corteva received a subpoena on May 29, 2020, from the FTC "directing it to submit documents pertaining to its crop protection products generally, as well as business plans, rebate programs, offers, pricing and marketing materials specifically related to its acetochlor, oxamyl and rimsulfuron and other related products in order to determine whether Corteva engaged in unfair methods of competition through anticompetitive conduct."

78.     Defendants also knew that by decisively acting together to strangle FBN and prevent fair, transparent competition in the United States and Canada, they could discourage future electronic platforms from adopting such a model. One PACE Council member observed, "I think it would be crazy, stupid to ignore [FBN]. Even if they end up going away, the business model they've introduced to agriculture will probably be tried by someone else."

79.     By coordinating the boycott to cut off FBN's access to the Crop Input market, Defendants implicitly threatened other potential electronic platforms looking at similar models based on transparency and competition. The threat was heard loud and clear by others looking to get into the Crop Input market. Another electronic platform decided just to provide an online ordering platform for existing retailers. The reason for that decision: how FBN was stymied: "I think FBN has done a lot of great things for this industry. On the FBN Direct side though, when you break that part out from the rest of their business, there has been some execution struggles and its caused a negative ripple effect for all of digital commerce. Like any new initiative, there are a

---

[19] Application Record, *The Commissioner of Competition v. Bayer Cropscience Inc. and Monsanto Canada ULC*, Court File No. T-159-20, pp. 12-14 (Jan. 30, 2020).

lot of lessons you've got to learn, and sometimes you've got to learn them the hard way. For us, we studied that model, learned from it, and designed AgVend to avoid those negative experiences. Which is why our model relies on partnering with the channel, rather than trying to cut them out of the equation."[20]

80.     This threat to the Crop Input supply chain was also heard by manufacturers of generic products (Crop Inputs that no longer retain patent protection). A June 2018 *Forbes* article reported some generic chemical products manufacturers are holding back on supplying FBN because they are "wary of angering their existing sales channels [i.e., wholesalers and retailers]." One generic products manufacturer CEO confirmed that "[i]n an ideal world, if I could flip the switch and sell to these guys, I would do it in a heartbeat."

## D.   Defendants' Concerted Action was Made Possible though Ample Formal and Informal Means

81.     Defendants' scheme required them to work together to block new electronic platforms from accessing Crop Inputs and thus trapping farmers into higher-priced purchases in the inefficient and opaque Crop Inputs market. None of the Defendants could have individually pulled off this scheme to defraud. Given the structure of the Crop Inputs industry with the necessary relationships between the manufacturers, wholesalers, and retailers, an effective boycott of new electronic platforms would not have been feasible or possible absent actual coordination and cooperation among Defendants. The scheme was strengthened by the fact that these major industry players used their prestige and logos to lull the world into believing their misrepresentations about FBN's business model and their decision not to sell to FBN.

82.     Defendants have multiple networks for inter-firm communications to form and

_____

[20] Matthew Grassi, "Commodity Classic 2019: E-Commerce Updates from AgVend, FBN," *CropLife* (Mar. 11, 2019), https://www.croplife.com/crop-inputs/commodity-classic-2019-e-commerce-updates-from-agvend-fbn/.

maintain the Crop Market Manipulation Enterprise through trade association participation and to use their trade industry associations to push their false narratives about FBN and Defendants' refusal to sell to FBN.

83.     One of the major places for coordination is CropLife America, a trade association that represents companies that develop, register, and sell pesticide in the United States. Only Manufacturers and Distributors of Crop Inputs are eligible for full membership in CropLife America.

84.     CropLife's Board of Directors meets annually to discuss developments in the Crop Inputs market and has specifically discussed the entry of electronic platforms. CropLife is funded by its Members and reported historic high funding levels from its Members over the last decade to defend the industry.

85.     CropLife's Board of Directors is chaired by an executive from one of the Manufacturer Defendants—currently BASF's Paul Rea and previously Corteva's Suzanne Wasson. For the 2016 to 2019 term, CropLife's Board of Directors also included executives from Defendants Bayer, Growmark, Tenkoz, and Simplot. The current board also includes an executive from Winfield's parent company, Land O'Lakes. The Board of Directors exclusively comprises representatives from large Crop Inputs manufacturers, distributors, and retailers, making it an ideal vehicle for collusion.

86.     When the consolidation and anti-competitive effects of the Crop Inputs have been called into question, Defendants have regularly coordinated through CropLife America to fight threats to their market power. For example, when Senator Elizabeth Warren targeted Defendants Bayer, Corteva, and Syngenta for recent mergers consolidating the Crop Inputs industry and squeezing out small family farms, CropLife America spoke out on behalf of Defendants to justify

the consolidation. Similarly, when the Ninth Circuit concluded that EPA's registrations of Manufacturer Defendants' dicamba pesticide products did not adequately consider the products' anti-competitive effects, CropLife America wrote on behalf of its member companies, including Defendants, in support of the EPA decision.

87.     The Agricultural Retailers Association ("ARA") hosts an annual in-person industry conference every year, which is attended by representatives from all major Crop Inputs retailers, as well as representatives from each Defendant. These industry conferences provide ample opportunity for Defendants to not only agree among themselves how to block electronic platforms from emerging, but also to coordinate with the other levels of the distribution chain. In fact, as noted above, the threat posed by FBN was the primary discussion topic at the PACE Advisory Council's 2017 annual meeting. Over the last decade, CropLife America has reported that they have improved cooperation and camaraderie with the Agricultural Retailers Association.

88.     Media reporting has also confirmed that major farmer retailers and wholesalers have circulated letters and emails urging farmers and manufacturers to avoid FBN.[21]

89.     Initial documents obtained by the Canadian Competition Bureau show that these same market players shared strategies on how to stymie FBN in Canada and pretextual justifications for their actions. For example, one Univar executive sent his team talking points to justify its decision to boycott FBN and encouraged them to share the message with retailers. The executive also shared the talking points with its manufacturer suppliers. The executive noted that he has already talked to manufacturer suppliers about FBN and whether to sell to them during the week of April 2, 2018.

---

[21] Jacob Bunge, "Tech Startup, Trying to Be Amazon for Farms, Runs into Ag Giants," *The Wall Street Journal* (Aug. 30, 2020), https://www.wsj.com/articles/tech-startup-trying-to-be-amazon-for-farms-runs-into-ag-giants-11598811850

90.     It should not be surprising that Defendants' response to the FBN's market threat was to engage in illicit and anticompetitive behavior. Several Defendants are antitrust recidivists. Competition experts have noted that past experience with participating in cartels enables companies to spot opportunities to profitably engage in anticompetitive conduct while evading detection. Competition Policy International maintains a list of the "fifty-two leading recidivists," in which BASF and Bayer are among the top five leading antitrust recidivists. Corteva is also on the list.

91.     Given the structure of the Crop Inputs industry with the necessary relationships between manufacturers, wholesalers, and retailers, an effective boycott of electronic platforms would not have been feasible absent actual coordination and cooperation among Defendants. The boycott would only work if each Manufacturer Defendant agreed to the plan; otherwise, the Manufacturer Defendant that broke from the boycott could have established itself as the primary supplier to electronic platforms and grown its customer base by operating a new distribution channel for its Crop Inputs, taking market share from its rival manufacturers.

92.     For these reasons, absent an agreement among them, Defendants' actions were against their independent economic self-interest. For any one or more of the Defendants to provide Crop Inputs to electronic platforms presented a significant business opportunity because those platforms: (1) represented well-financed customers ready to purchase Crop Inputs in bulk quantity from a Manufacturer or Wholesaler Defendant; (2) would simplify the distribution channel and permit Manufacturer Defendants to retain more profit by reducing or eliminating the need for transport costs, rebates, and incentive programs to wholesalers and retailers; and (3) presented an opportunity for an individual Manufacturer Defendant to increase profits by growing its market share through sales to farmers nationwide, not merely where its authorized retailers were located

or enjoyed the largest market share within a specific geographic area.

### E. __Antitrust Impact__

93.    Defendants' conduct has substantially impaired competition in the retail sale market for Crop Inputs by excluding electronic platforms, including FBN, from competing in that market.

94.    Defendants' conduct in boycotting and preventing electronic platforms from competing in the retail sales market for Crop Inputs lacks any procompetitive justification. Moreover, the harm to competition and the resulting antitrust injury—suffered by both farmers and other consumers of Crop Inputs—more than offsets any procompetitive justifications Defendants may offer.

### F. __Antitrust Injury__

95.    Plaintiff and Class Members have suffered antitrust injury as a direct result of Defendants' unlawful conduct.

96.    By impairing competition in the retail sales market for Crop Inputs and by excluding electronic platforms from competing in that market, Defendants have had the following effects, among others:

a.    Price competition has been restrained or eliminated with respect to Crop Inputs;

b.    The prices of Crop Inputs have been fixed, raised, stabilized, or maintained at artificially inflated levels;

c.    Purchasers of Crop Inputs have been deprived of free and open competition; and

d.    Farmers paid artificially-raised prices for Crop Inputs, and ultimately the prices paid by consumers for farm products, including corn and grain.

28

### G. **Equitable Tolling, Discovery Rule, and Fraudulent Concealment**

97.     Plaintiff repeats and re-alleges the allegations set forth above. At all times relevant to this Complaint, Defendants took active steps to conceal their unlawful activities, including the combination and conspiracy alleged herein.

98.     **Discovery Rule:** Plaintiff and the members of the Class had no knowledge or reason to know of the combination or conspiracy alleged herein until on or about (at the earliest) August 6, 2020, the date when the Corteva confirmed in its public 10-Q filing that the FTC had issued a subpoena directing Corteva to submit documents pertaining to potential anticompetitive conduct in the Crop Inputs market.

99.     Plaintiff and the Class are consumers who do not have the training or means from which they could have discovered the combination and conspiracy described in this Complaint before August 6, 2020, if then.

100.     Information regarding the unlawful conduct described herein, including the combination or conspiracy alleged, was not available to Plaintiff and members of the Class prior to August 6, 2020, the date when the Corteva confirmed in its public 10-Q filing that the FTC had issued a subpoena directing Corteva to submit documents pertaining to potential anticompetitive conduct in the Crop Inputs market. Plaintiff and members of the Class had no previous, reasonable means of obtaining the facts or information concerning the Defendants' unlawful activities, including the combination and conspiracy alleged herein, all of which were purposefully concealed by Defendants.

101.     For these reasons, the statute of limitations as to Plaintiff's and the Class' claims did not begin to run and has been tolled with respect to the claims that Plaintiff and the members of the Class have alleged in this Complaint.

102.     **Fraudulent Concealment and/or Equitable Tolling:** In the alternative,

application of the doctrine of fraudulent concealment and/or equitable tolling tolled the statute of limitations on the claims asserted herein by Plaintiff and the Class. Plaintiff and the members of the Class did not discover, and could not have reasonably discovered, the existence of the conspiracy alleged herein until on or about (at the earliest) August 6, 2020, the date when the Corteva confirmed in its public 10-Q filing that the FTC had issued a subpoena directing Corteva to submit documents pertaining to potential anticompetitive conduct in the Crop Inputs market.

103.    Before that time, Plaintiff and the members of the Class were unaware of Defendants' unlawful conduct and did not know before then that they were unlawfully restricting the Crop Inputs market. Defendants provided no information, actual or constructive, to Plaintiff and members of the Class.

104.    The affirmative acts of Defendants alleged herein were wrongfully concealed and carried out in a manner that precluded detection.

105.    By their very nature, Defendants' anticompetitive conspiracy and fraudulent scheme were self-concealing. Crop Inputs are not exempt from antitrust and RICO regulation and, thus, Plaintiff and members of the Classes reasonably considered the Crop Inputs industry to be a competitive industry. Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of the Defendants' Crop Input prices before August 6, 2020.

106.    Plaintiff and the members of the Classes could not have discovered the alleged unlawful activity, including the conspiracy or combination alleged herein, at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by the Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their unlawful conduct.

107.    Because the alleged unlawful conduct, including the combination or conspiracy alleged herein was self-concealing and affirmatively concealed by Defendants, Plaintiff and members of the Classes had no knowledge of the alleged unlawful conduct, or of any facts or information that would have caused a reasonably diligent person to investigate, before August 6, 2020.

108.    For these reasons, the statute of limitations applicable to Plaintiff's and the Classes' claims was tolled and did not begin to run until August 6, 2020.

109.    **Continuing Tort**: Defendants are estopped from relying on any statute of limitations defense because their illegal, deceptive, and fraudulent practices as alleged herein, which are continuing, have created continuing and repeated injuries to Plaintiff and the Class.

## CLASS ACTION ALLEGATIONS

110.    Plaintiff incorporates by reference all allegations above as if fully set forth herein.

111.    Pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure, Plaintiff brings this suit individually and on behalf of all others similarly situated across the United States (the "Nationwide Class"), defined as:

> All persons or entities in the United States and its territories who purchased a Crop Input for their own use and not for resale from January 1, 2014, through and until Class Notice is given (the "Class Period").

Excluded from the Class are:

a.    The Defendants and their officers, directors, management, employees, subsidiaries, or affiliates;

b.    All governmental entities;

c.    The judges in this case and any members of their immediate families;

d.    All persons who are presently in bankruptcy proceedings or who obtained a bankruptcy discharge in the last three years; and

e.    All persons who are currently incarcerated.

112.    Pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure, Plaintiff brings this suit individually and on behalf of all others similarly situated across Kansas (the "Kansas Class"), defined as:

> All persons or entities in Kansas who purchased a Crop Input for their own use and not for resale from January 1, 2014, through and until Class Notice is given (the "Class Period").

Excluded from the Class are:

    a.   The Defendants and their officers, directors, management, employees, subsidiaries, or affiliates;

    b.   All governmental entities;

    c.   The judges in this case and any members of their immediate families;

    d.   All persons who are presently in bankruptcy proceedings or who obtained a bankruptcy discharge in the last three years; and

    e.   All persons who are currently incarcerated.

113.    The Class consists of thousands of Crop Input purchasers residing throughout the United States. Accordingly, it would be impracticable to join all Class members before this Court.

114.    Members of the Class are readily identifiable from information and records in Defendants' possession.

115.    Pursuant to Rule 23(b)(3), there are numerous and substantial questions of law or fact common to all of the members of the Class that predominate over any individual issues that pertain to individual Class members, including:

    a.   Whether Defendants engaged in a scheme to defraud by intentionally blocking electronic platforms, including FBN, from access to Crop Inputs by agreeing not to sell products to them and misrepresenting the reasons for that decision;

    b.   Whether Defendants formed an enterprise (the "**Crop Input Market Manipulation Enterprise**") within the meaning of RICO;

    c.   Whether Defendants engaged in a pattern of racketeering to defraud purchasers of Crop Inputs through blocking electronic platforms,

including FBN, from access to Crop Inputs by agreeing not to sell products to them and misrepresenting the reasons for that decision;

d.    Whether Defendants engaged in a combination or conspiracy amongst themselves to fix, raise, maintain, and/or stabilize the prices of Crop Inputs in the United States;

e.    The duration of the alleged combination or conspiracy and nature of the acts carried out by Defendants in furtherance of the combination or conspiracy;

f.    Whether the alleged combination or conspiracy violated Section 1 of the Sherman Act;

g.    Whether the alleged combination or conspiracy had the effect of artificially inflating the price of Crop Inputs sold in the United States during the Class Period;

h.    Whether Defendants conspired to unreasonably restrain trade in violation of federal antitrust laws;

i.    Whether Defendants' anti-competitive scheme to defraud suppressed competition;

j.    Whether Defendants' scheme to defraud, in whole or in part, has substantially affected interstate and intrastate commerce; and

k.    The quantum of aggregate class-wide damages to the Class as a result of Defendants' misconduct.

116.   Plaintiff's claims are typical of those of the Class because their claims arise from the same facts and turn on the above questions of law and/or fact along with all Class members, there is a sufficient relationship between the damage to Plaintiff and Defendants' conduct similarly affecting all Class members, and Plaintiff has no interests adverse to the interests other Class members.

117.   Plaintiff will fairly and adequately protect the interests of Class members and has retained counsel experienced and competent in the prosecution of complex class actions, including complex questions that frequently arise in similar antitrust and RICO litigation.

118.   A class action is superior to other methods for the fair and efficient adjudication of this controversy, since individual joinder of all Class members is impracticable and no other

method of adjudication of the claims asserted herein is more efficient and manageable for at least the following reasons:

      a.      The liability claims presented in this case predominate over any questions of law or fact, if any exist at all, affecting any individual Class members;

      b.      Absent certification, Class members will continue to suffer damage and Defendants' unlawful conduct will continue without remedy while Defendants obtain further illegal profits;

      c.      Given the size of individual Class members' claims, few, if any, Class members could afford to or would seek legal redress individually for the wrongs Defendants committed against them, and absent Class members have no substantial interest in individually controlling the prosecution of individual actions;

      d.      When the liability of Defendants has been adjudicated, claims of all Class members can be administered efficiently and/or determined uniformly by the Court; and

      e.      This action presents no difficulty that would impede its management by the Court as a class action, which is the best available means by which Plaintiff and Class members can seek compensation for the harm caused to them by Defendants.

119.     Because Plaintiff seeks relief for all Class members, the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual Class members, which would establish incompatible standards of conduct for Defendants.

120.     Further, bringing individual claims would overburden the courts and be an inefficient method of resolving the dispute at the center of this litigation. Adjudications with respect to individual Class members would, as a practical matter, be dispositive of the interest of other Class members who are not parties to the adjudication and may impair or impede their ability to protect their interests. As a consequence, class treatment is a superior method for adjudication of the issues in this case.

**COUNT I**
**Violation of The Racketeer Influenced and Corrupt Organizations Act (Civil RICO)**
**under 18 U.S.C. § 1962(c) and (d)**
**(on behalf of Plaintiff and the Nationwide Class)**

121.     Plaintiff incorporates by reference all allegations above as if fully set forth herein.

122.     Plaintiff brings Count I on behalf of the Class against all Defendants.

123.     At all relevant times, Defendants have been "persons" under 18 U.S.C. § 1961(3).

124.     Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).

125.     Section 1962(d) makes it unlawful for "any person to conspire to violate", among other provisions, Section 1962(c). *See* 18 U.S.C. § 1962(d).

126.     From at least 2016, to the present, Defendants have worked to manipulate the Crop Input market by blocking FBN's access to Crop Inputs by working together as an association-in-fact enterprise. These entities all participated directly or indirectly in a scheme to block electronic platforms from access to Crop Inputs by agreeing not to sell products to these platforms, including FBN, and misrepresenting the reasons for that decision ("**Crop Input Market Manipulation Enterprise**"). Through the Crop Inputs Market Manipulation Enterprise, Defendants obtained illegal profits.

127.     As a direct and proximate result of their fraudulent scheme and common course of conduct, Defendants have illegally extracted billions of dollars from Plaintiff and the Class. As explained in detail below, the years-long misconduct of Defendants violated RICO Sections § 1962(c) and (d).

A. **The Enterprise**

128.    At all relevant times, Defendants operated as an association-in-fact enterprise, which was formed for the purpose of engaging in a scheme to defraud to block electronic platforms from access to Crop Inputs by agreeing not to sell products to these platforms, including FBN, and misrepresenting the reasons for that decision.

129.    The Crop Inputs Market Manipulation Enterprise consists of the following entities and individuals:

a.   **The Manufacturer Defendants**

130.    Defendant Bayer CropScience Incorporated develops, manufactures, and sells Crop Inputs in the United States.

131.    Defendant Bayer CropScience LP is a crop science company that sells Crop Inputs in the United States.

132.    Bayer CropScience Incorporated and Bayer CropScience LP both operate as part of the Bayer Group's Crop Science division.

133.    Defendant Bayer (formerly known as Monsanto) secretly formed a task force in 2016 to study the long-term competitive impact of FBN's electronic platform.[22]

134.    Defendant Corteva Incorporated develops, manufactures, and sells Crop Inputs in the United States.

135.    Defendant BASF develops, manufactures, and sells Crop Inputs in the United States.

136.    Defendant Syngenta Corporation develops, manufactures, and sells Crop Inputs in the United States.

---

[22] Application Record, *The Commissioner of Competition v. Bayer Cropscience Inc. and Monsanto Canada ULC*, Court File No. T-159-20, pp. 13-14, 18 (Jan. 30, 2020).

137.    Each of these Defendants is a "person" under 18 U.S.C. § 1961(3).

138.    Each operated or managed the affairs of an enterprise, the Crop Input Market Manipulation Enterprise, through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

b.  **The Wholesaler Defendants**

139.    Defendant Cargill, Incorporated owns and operates a wholesaler, AgResource Division, which distributes Crop Inputs to Cargill's retail network and to retailers. Cargill's AgResource Division maintains contracts with each of Bayer, Corteva, BASF, and Syngenta entitling it to purchase and distribute branded Crop Inputs and entitling it to special rebates.

140.    Defendant Winfield Solutions, LLC is a Crop Inputs wholesaler. It maintains contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute branded Crop Inputs and entitling it to special rebates. Winfield is also a major Crop Inputs retailer that operates as a cooperative owned by its members, which are 650 Crop Inputs retail businesses operating 2,800 retail locations throughout the United States and parts of Canada.

141.    Defendant Univar Solutions, Incorporated is a Crop Inputs wholesaler. Univar maintains contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute branded Crop Inputs and entitling it to special rebates.

142.    Each of the Defendants is a "person" under 18 U.S.C. § 1961(3).

143.    Each operated or managed the affairs of an enterprise, the Crop Input Market Manipulation Enterprise, through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

c.  **Retailer Defendants**

144.    Defendant CHS Incorporated is one of the largest Crop Inputs wholesalers in the United States. Like many large wholesalers, it also operates retail networks bearing the CHS brand

around the country that sell Crop Inputs from brick-and-mortar stores. CHS and the retail networks it operates maintain contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute Crop Inputs and entitling it to special rebates.

145.    Defendant Nutrien Ag Solutions, Inc. is both a Crop Inputs wholesaler and the largest Crop Inputs retailer in the United States. It sells Crop Inputs to farmers throughout the country and maintains contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute Crop Inputs and entitling it to special rebates.

146.    Defendant GROWMARK, Incorporated, d/b/a Farm Supply or FS, is a large Crop Inputs retailer with brick-and-mortar locations throughout the Midwestern United States. Growmark maintains contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute Crop Inputs and entitling it to special rebates.

147.    Defendant Simplot AB Retail Sub, Incorporated, f/k/a Pinnacle Agriculture Distribution, Incorporated, is a large Crop Inputs wholesaler and retailer that operates 135 retail locations across 27 states. Simplot maintains contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute Crop Inputs and entitling it to special rebates.

148.    Defendant Tenkoz Inc. is one of the largest Crop Inputs retailers in the United States. Tenkoz purchases and sells 25% of all crop protection chemicals sold in the United States annually through 550 retail locations and 70 wholesale locations around the country. Tenkoz maintains contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute Crop Inputs and entitling it to special rebates.

149.    Defendant Federated Co-operatives Ltd. is a large Crop Inputs retailer. It maintains contracts with each of Bayer, Corteva, BASF, and Syngenta authorizing it to purchase and distribute Crop Inputs and entitling it to special rebates. Federated is under investigation by the

Canadian Competition Bureau for engaging in coordinated anticompetitive practices designed to exclude competition in the Crop Inputs market.

150.     Each of the Retailer Defendants is a "person" under 18 U.S.C. § 1961(3).

151.     Each operated or managed the affairs of an enterprise, the Crop Input Market Manipulation Enterprise, through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

**B.   Essential Purpose of Enterprise was the Scheme to Defraud.**

152.     At all relevant times, the Crop Inputs Market Manipulation Enterprise: (a) had an existence separate and distinct from each of the Defendants; (b) was separate and distinct from the pattern of racketeering in which Defendants engaged; and (c) was an ongoing and continuing organization consisting of legal entities, including the Manufacturer Defendants, the Wholesaler Defendants, the Retailer Defendants, and other entities and individuals associated for the common purpose of blocking electronic platforms, including FBN, from access to Crop Inputs by agreeing not to sell products to them and misrepresenting the reasons for that decision.

153.     Defendants had a strong motive to conspire to preserve their opaque market structure. If electronic platforms publicly published price lists for specific Crop Inputs, then the Manufacturer, Wholesaler, and Retailer Defendants could no longer keep prices confidential and charge inflated prices for identical Crop Inputs and/or maintain price opacity through seed relabeling and bundling.

154.     The Retailer Defendants and the Wholesaler Defendants knew that to retain their market positions and maintain their profit margins, they had to exclude electronic platforms from the market, so they conspired to cut off the platforms' product supply. Because the Manufacturer Defendants rely on the Retailer and Wholesaler Defendants to recommend and sell the Manufacturer Defendants' products to farmers, the Retailer and Wholesaler Defendants had to

convince the Manufacturer Defendants to agree not to supply FBN and other platforms in order to make the boycott effective.

155.    Each member of the Crop Inputs Market Manipulation Enterprise shared in the financial windfall generated by the enterprise, and each member shared in the common purpose of forcing farmers to purchase Crop Inputs at supra-competitive prices.

156.    FBN threatened the Defendants' dominant market position and control over Crop Inputs pricing. As a result, rather than compete fairly with FBN, Defendants conspired to block its access to Crop Inputs by engaging in a group boycott. For instance, the Manufacturer, Wholesaler, and Retailer Defendants repeatedly blocked FBN's access to Crop Inputs by agreeing among themselves not to sell products to FBN.

157.    Given the structure of the Crop Inputs industry with the necessary relationships between manufacturers, wholesalers, and retailers, an effective boycott of electronic platforms would not have been feasible absent actual coordination and cooperation among Defendants. Absent an agreement among themselves, Defendants' actions were against their independent economic self-interests.

158.     The Crop Inputs Market Manipulation Enterprise engaged in, and its activities affected interstate and foreign commerce, because it involved commercial activities across state and national boundaries, such as the marketing, promotion, advertisement and sale or lease of the Crop Inputs throughout the country, and the receipt of monies from the sale of the same.

159.    Within the Crop Inputs Market Manipulation Enterprise, there was a common communication network by which co-conspirators shared information using the interstate mails and wires on a regular basis.

160.    Each member of the Crop Inputs Market Manipulation Enterprise had a systematic

linkage to the others through corporate ties, contractual relationships, financial ties, and continuing coordination of activities.

161.    Through the Crop Inputs Market Manipulation Enterprise, Defendants functioned as a continuing unit with the common purpose of furthering the illegal scheme and their common purposes of blocking electronic platforms, including FBN, from accessing Crop Inputs by agreeing not to sell products to these platforms and misrepresenting the reasons for that decision.

162.    The ordinary business of Defendants is to engage in the manufacture, distribution, and sale of Crop Inputs. It is not part of their routine business to engage in acts of mail and wire fraud to block farmer access to alternative market participants and misrepresent the reasons for these decisions.

163.    While Defendants participated in, and are members of, the enterprise, they have a separate existence from the enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

164.    Defendants directed and controlled the ongoing organization necessary to implement the scheme at meetings and through communications of which Plaintiff cannot fully know at present, because such information lies in the exclusive control of Defendants.

165.    This enterprise has continued for over four years (since 2016), and the enterprise (and pattern of racketeering) are ongoing and open-ended.

C. **The Participation of Defendants in the Crop Inputs Market Manipulation Enterprise**

166.    Upon information and belief, Defendants are, and have been, in regular and constant communication regarding the Crop Inputs market.

167.    Upon information and belief, Defendants were all deeply involved in the Crop

Inputs Market Manipulation Enterprise.

168.     The Crop Inputs Market Manipulation Enterprise depended upon Defendants working together in shared concert to block new electronic platforms from accessing Crop Inputs and thus trapping farmers into higher-priced purchases in the inefficient and opaque Crop Inputs market. None of the Defendants could have individually pulled off this scheme to defraud. Given the structure of the Crop Inputs industry with the necessary relationships between the manufacturers, wholesalers, and retailers, an effective boycott of new electronic platforms would not have been feasible or possible absent actual coordination and cooperation among Defendants. The scheme was strengthened by the fact that these major industry players used their prestige and logos to lull the world into believing their misrepresentations about FBN's business model and their decision not to sell to FBN.

169.     Defendants have multiple networks for inter-firm communications to form and maintain the Crop Market Manipulation Enterprise through trade association participation and to use their trade industry associations to push their false narratives about FBN and Defendants' refusal to sell to FBN.

170.     One of the major places for coordination is CropLife America, a trade association that comprises major Crop Inputs manufacturers, wholesalers, and retailers. CropLife's Board of Directors is chaired by an executive from one of the Manufacturer Defendants—currently BASF's Paul Rea and previously Corteva's Suzanne Wasson. For the 2016 to 2019 term, CropLife's Board of Directors also included executives from Defendants Bayer, Growmark, Tenkoz, and Simplot. The Board of Directors exclusively comprises representatives from large Crop Inputs manufacturers, distributors, and retailers, making it an ideal vehicle for collusion.

171.     The Agricultural Retailers Association ("ARA") hosts an annual in-person industry

conference every year, which is attended by representatives from all major Crop Inputs retailers, as well as representatives from each Defendant. These industry conferences provide ample opportunity for Defendants to not only agree among themselves how to block electronic platforms from emerging, but also to coordinate with the other levels of the distribution chain. In fact, as noted above, the threat posed by FBN was the primary discussion topic at the PACE Advisory Council's 2017 annual meeting.

172.     The coordination through the Crop Inputs Market Manipulation Enterprise to block sales to FBN by Defendants was also not the first time Defendants had worked together to stop similar competition. Prior to 2016, manufacturers and the distribution channel partners recognized the threat from transparent, electronic platforms and worked together to block the threat when XSAg.com entered the market. Similarly, in 2018, Defendants continued to work together through Crop Input Market Manipulation Enterprise to counter an additional threat: FBN's entrance into the Canadian market. While many Defendants had initially agreed to continue their supply of FBN's Canadian retailer, a coordinated campaign through the Crop Input Market Manipulation Enterprise kicked in including through communications over the wires. The boycott was swift and covered the vast majority of the Crop Input market.

173.     Given the structure of the Crop Inputs industry with the necessary relationships between manufacturers, wholesalers, and retailers, an effective boycott of electronic platforms would not have been feasible absent actual coordination and cooperation among Defendants. The boycott would only work if each Manufacturer Defendant agreed to the plan; otherwise, the Manufacturer Defendant that broke from the boycott could have established itself as the primary supplier to electronic platforms and grown its customer base by operating a new distribution channel for its Crop Inputs, taking market share from its rival manufacturers.

174.    Defendants are in the regular business of making, distributing, and selling Crop Inputs. It is not routine for them to engage in fraudulent activities or to engage in a pattern of mail and wire fraud.

175.    Defendants have worked together on the scheme to defraud in shared concert since at least 2016, when FBN attempted to enter the Crop Input market.

### D.  **The Pattern of Racketeering: Mail Fraud and Wire Fraud**

176.    To carry out the scheme to defraud, Defendants knowingly participated, directly or indirectly, and conducted the affairs of the Crop Inputs Market Manipulation Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c), and which employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

177.    The predicate acts of racketeering (18 U.S.C. § 1961(1)) engaged in by Defendants include, but are not limited to:

a.  Mail Fraud:  Defendants violated 18 U.S.C. § 1341 by engaging in an unlawful scheme to defraud involving false pretenses, misrepresentations, promises, half-truths, and omissions. In furtherance of this scheme, Defendants used the mails:

▪  Defendants shipped, or caused to ship, via interstate mail Crop Inputs to wholesalers, retailers, and farmer, and others that were distributed and purchased based on Defendants' market manipulation to exclude FBN.

▪  Defendants used the mails in furtherance of their scheme to defraud and, in fact, could not have accomplished their scheme to defraud without using the mails to ship Crop Inputs nationwide to victims in all fifty states.

b.    Wire Fraud:  Defendants violated 18 U.S.C. § 1343 by engaging in an unlawful scheme to defraud involving false pretenses, misrepresentations, promises, half-truths, and omissions. In furtherance of this scheme, Defendants

used the interstate wires.

▪ Defendants communicated with farmers via wire to provide false pretenses, misrepresentations, promises, half-truths, omissions, and lulling statements about FBN and their illicit boycott. For example:

   o  Upon learning about FBN's 2016 entry into the U.S. market as an electronic Crop Inputs sales platform, CHS officials distributed a letter to farmers attempting to discourage them from using FBN, falsely claiming that although an electronic platform like FBN would be able to offer the same products at cheaper prices, "FBN just does it with little overhead and without returning any profits to you the farmer, while lining the pockets of investors and big data companies like Google."[23]

   o  In fall 2018, after Syngenta's Head of Crop Protection Sales in the U.S. learned that a small number of branded Crop Inputs had been sold on electronic platforms in violation of Defendants' boycott, he falsely claimed that electronic platforms would deliver counterfeit products. He further claimed that "[w]hen online entities acquire products from sources other than authorized dealers or contracted distributors, you'd better question and be concerned about the quality."

   o  In its attempts to pressure all sellers to participate in the boycott of FBN, Syngenta's Head of U.S. Crop Protection Sales falsely justified its audit initiative by stating in a message sent over the wires: "We have concerns about product integrity, stewardship, and regulatory compliance."[24]

   o  In announcing its decision not to deal with FBN in Canada, Univar, using the wires, distributed talking points on its decision and urged team members to share these talking points with retailers: "FBN is a data company that wants to collect and aggregate data to eventually sell for a profit to companies that will use the data to make farmers grow us food for nothing . . . If anyone thinks socialism is going to feed the world[,] just call Russia first and see how that worked out." Univar further criticized FBN's business model of bringing market transparency to farmers, declaring that "[m]argin compression is not the way to a brighter future and that is all FBN is currently offering." These talking points were also shared over the wires with its manufacturer suppliers.

▪ Defendants used the interstate wires to receive and process payments from their illicit sales of the Crop Inputs based on a scheme to defraud to block electronic platforms from access to Crop Inputs by agreeing not to sell products to these platforms, including

---

[23] Jacob Bunge, "Tech Startup, Trying to Be Amazon for Farms, Runs into Ag Giants," *The Wall Street Journal* (Aug. 30, 2020), https://www.wsj.com/articles/tech-startup-trying-to-be-amazon-for-farms-runs-into-ag-giants-11598811850.

[24] Jacob Bunge, "Tech Startup, Trying to Be Amazon for Farms, Runs into Ag Giants," *The Wall Street Journal* (Aug. 30, 2020), https://www.wsj.com/articles/tech-startup-trying-to-be-amazon-for-farms-runs-into-ag-giants-11598811850

FBN, and misrepresenting the reasons for that decision.

178.    In doing so, Defendants have deceived and cheated farmers out of billions of dollars for the last several years.

179.    This pattern of racketeering is open-ended and remains ongoing. Only by pursuing this lawsuit and financially punishing Defendants will the pattern of racketeering at issue here finally cease.

180.    The predicate acts are all related because they were all done in furtherance of the same overall goal and common purpose of the RICO enterprise: to force farmers to pay supra-competitive prices for Crop Inputs by blocking FBN (and dissuading others) from participating in the Crop Input market and bringing increased transparency to farmers.

**E.  Causation and Damages**

181.    Because it forces farmers to remain in an inefficient and opaque Crop Inputs market, the Crop Inputs Market Manipulation Enterprise directly caused farmers to pay more for Crop Inputs than they would have but for Defendants' wrongful conduct. There is a direct and straight line from the scheme to defraud to the damages suffered.

182.    There are no intervening steps or causes that could have prevented or altered or even interfered with the Crop Inputs Market Manipulation Enterprise.

183.    All purchasers of the Crop Inputs purchased Crop Inputs in reasonable reliance upon the representations that the marketplace was not being illegally manipulated.

184.    The exact purchase history of consumers, at the level of the individual consumer, is available from Retailer Defendants, other retailers, and other relevant data sources, so there is no real risk that the class will include any class members who were not harmed by Crop Inputs Market Manipulation Enterprise. The class will include those who purchased the Crop Inputs during the time of the market manipulation.

185.    By reason of and as a result of the conduct of Defendants, Plaintiff and Class members have been injured in their property through higher costs, less choice, and/or fewer innovative products or services. Plaintiff and Class Members are forced to pay more for Crop Inputs than they otherwise would have, have lost choices, and have lost the opportunity to purchase new and innovative products and services.

186.    The violations of 18 U.S.C. § 1962(c) and (d) by Defendants have directly and proximately caused injuries and damages to Plaintiff and Class members, and Plaintiff and Class members are entitled to bring this action for three times their actual damages, as well as costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(a) and (c).

**COUNT II**
**Violation of The Sherman Act: Conspiracy to Restrain Trade**
**in Violation of the Sherman Act (15 U.S.C. § 1)**
**(on behalf of Plaintiff and the Nationwide Class)**

187.    Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

188.    Beginning at a time currently unknown to Plaintiff, but at least as early as January 1, 2014 (further investigation and discovery may reveal an earlier date), and continuing through the present, the exact dates being unknown to Plaintiff, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy, in restraint of trade artificially to raise, fix, maintain, and/or stabilize prices for Crop Inputs in the United States, in violation of Section I of the Sherman Act, 15 U.S.C. § 1.

189.    In formulating and carrying out the alleged agreement, understanding, and conspiracy, the Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth above, and the following, among others: engaged in a combination or conspiracy in restraint of

47

trade to artificially raise, fix, maintain, and/or stabilize prices for Crop Inputs that Defendants sold to Plaintiff and members of the Classes, principally but not exclusively, by jointly boycotting entities that would have introduced price-reducing electronic purchasing of Crop Inputs in the United States.

190.     Defendants' actions were not mere parallel conduct but took place in the context of multiple indicia of a conspiratorial agreement.

191.     This conspiracy is a *per se* violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

192.     Alternatively, this conspiracy is a "quick look" or rule of reason violation of Section 1 of the Sherman Antitrust Act. There is no legitimate business justification for, or pro-competitive benefits attributable to, Defendants' conspiracy and overt acts in furtherance thereof. Any proffered business justification or asserted pro-competitive benefits would be pre-textual, outweighed by the anticompetitive effects of Defendants' conduct, and in any event, could be achieved by means less restrictive than the conspiracy and overt acts alleged herein.

193.     Plaintiff and members of the Classes directly purchased Crop Inputs from Defendants and their co-conspirators at supra-competitive prices, suffering antitrust injury and damages as a material, direct, and proximate result of Defendants' conspiracy and overt acts in furtherance thereof.

194.     Plaintiff and members of the Classes have been injured in their business and property by reason of Defendants' violation of Section 1 of the Sherman Act, within the meaning of Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15.

195.     Plaintiff and members of the Classes are threatened with future injury to their business and property by reason of Defendants' continuing violation of Section 1 of the Sherman

Act, within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

196.    Plaintiff and members of the Classes are entitled to recover for the injury caused by Defendants' wrongful conduct and to an injunction against Defendants, preventing and restraining the violations alleged herein.

**COUNT III**
**Violation of The Kansas Restraint of Trade Act**
**(Kan. Stat. Ann. §§ 50-101, *et seq.*)**
**(on behalf of Plaintiff and the Kansas Class)**

197.    Plaintiff restates, re-alleges, and incorporates by reference each of the allegations set forth in the preceding paragraphs of this Complaint as if fully set forth herein.

198.    The Kansas Restraint of Trade Act aims to prohibit practices which, inter alia, "tend to prevent full and free competition in the importation, transportation or sale of articles imported into this state."

199.    Plaintiff and Members of the Kansas Class purchased Crop Inputs within the State of Kansas during the Class Period. But for Defendants' conduct set forth herein, the price of Crop Inputs would have been lower, in an amount to be determined at trial.

200.    Defendants combined capital, skill, or acts for the purpose of creating restrictions in trade or commerce of Crop Inputs, increasing the price of Crop Inputs, preventing competition in the sale of Crop Inputs, and precluded free and unrestricted competition among themselves in the sale of Crop Inputs, in violation of Kan. Stat. Ann. §§ 50-101, et seq.

201.    Defendants' unlawful conduct and practices have substantial anticompetitive effects in Kansas, including increased prices and costs, reduced innovation, poorer customer service, and lowered output.

202.    Plaintiff and members of the Kansas Class were harmed by Defendants' anticompetitive conduct in a manner that the Kansas Restraint of Trade Act was intended to

prevent when they paid more for Crop Inputs than they would have paid in a competitive market. Plaintiff and members of the Kansas Class have suffered and continue to suffer damages and irreparable injury, and such damages and injury will not abate until an injunction ending Defendants' anticompetitive conduct issues. Plaintiff and members of the Kansas Class are also entitled to all other forms of relief, including actual damages and reasonable attorneys' fees and costs.

## DEMAND FOR JURY TRIAL

203.    Plaintiff respectfully demands a jury trial on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff respectfully requests the following relief:

a.    Determine that this action may be maintained as a class action pursuant to Fed. R. Civ. P. 23(a), (b)(3), and direct that reasonable notice of this action, as provided by Fed. R. Civ. P.  23(c)(2) be given to the Class;

b.    Appoint Plaintiff as Class Representative and Plaintiff's counsel as Class Counsel;

c.    That the unlawful conduct, conspiracy, or combination alleged herein be adjudged and decreed:

1.    An unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

2.    A *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

3.    An unlawful combination, trust, agreement, understanding, and/or concert of action in violation of the state antitrust laws as set forth herein; and

4.    An unlawful enterprise engaged in, or the activities of which affect, interstate or foreign commerce, that Defendants conduct or participate, directly or indirectly, in the conduct of through a pattern of racketeering activity.

d.    Order Defendants to disgorge unlawful profits;

e.   Award compensatory damages to Plaintiff and the proposed Class in an amount
to be established at trial;

f.   Award treble damages under the RICO statute;

g.   Award pre- and post-judgment interest;

h.   Award reasonable attorneys' fees and costs; and

i.   For all such other and further relief as may be just and proper.

Respectfully submitted,

/s/ *Rex A. Sharp*
Rex A. Sharp, #12350
Ruth Anne French-Hodson, # 28492
SHARP LAW, LLP
5301 W. 75th Street
Prairie Village, KS  66208
(913) 901-0505
(913) 901-0419 fax
rsharp@midwest-law.com
rafrenchhodson@midwest-law.com

Isaac Diel, #14376
Greg Bentz, #23128
SHARP LAW, LLP
6900 College Blvd., Suite 285
Overland Park, KS 66211
(913) 901-0505
(913) 901-0419 fax
idiel@midwest-law.com
gbentz@midwest-law.com

*Counsel for Plaintiff Melinda Budde*

51